United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 21, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-30545** |
| JAGANNATHAN MAHADEVAN, | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| PREM BIKKINA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3054** |
| | § | |
| JAGANNATHAN MAHADEVAN, | § | |
| | § | |
| Defendant. | § | |

### <u>MEMORANDUM OPINION</u>

This adversary action stems from a bitter hostility between Prem Bikkina ("*Bikkina*") and his former professor, Jagannathan Mahadevan ("*Mahadevan*") leading to Bikkina obtaining a judgement against Mahadevan in California state court for $776,0000.[1] Bikkina now seeks a judgment from this Court declaring that Mahadevan's debt, arising from the California state-court judgment entered on August 1, 2018, in the Alameda Superior Court, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).[2] Upon reversing a summary judgement entered in favor of Bikkina, the district court remanded this case to this Court with instructions to determine whether Mahadevan was willful and malicious in defaming Bikkina and inflicting emotional distress on Bikkina under 11 U.S.C. § 523(a)(6).[3]

The Court held a trial starting on April 1, 2024, and concluding on August 22, 2024.[4]

---

[1] ECF No. 1.
[2] ECF No. 1.
[3] ECF No. 51.
[4] *See* April 1, 2024 Min. Entry; Aug. 22, 2024 Min Entry.

For all the reasons discussed *infra*, Mahadevan was willful and malicious in inflicting emotional distress on Bikkina and was also willful and malicious in defaming Bikkina. Accordingly, Mahadevan's judgement debt owed to Bikkina as set forth in the California state-court judgment entered on August 1, 2018,[5] totaling $776,000, is excepted from discharge as a debt for a willful and malicious injury to another entity or to the property of another entity pursuant to 11 U.S.C. § 523(a)(6).[6]

## I. FINDINGS OF FACT

### A. Background

Mahadevan was a professor, and Bikkina a graduate student, at the University of Tulsa ("*Tulsa*").[7] Mahadevan became Bikkina's dissertation advisor in 2007.[8] In 2010 Bikkina filed a request with Tulsa to be assigned a new dissertation advisor, which was granted.[9] Bikkina alleges he requested to change dissertation advisors because Mahadevan was delaying Bikkina's progress toward his PhD by changing his research topic multiple times, and had disagreements with Bikkina over technical concepts, which lead to harassment by Mahadevan.[10] Bikkina testified that Mahadevan harassed him, for example, by saying "Prem, I am going to screw you" after a disagreement with Bikkina over a technical research procedure.[11] Mahadevan denies making such comments and asserts that Bikkina left his research group because Bikkina refused to adhere to Mahadevan's instructions to correct research data that was contaminated by Bikkina's faulty research procedure.[12]

---

[5] ECF No. 141-2.
[6] ECF No. 141-2 at 5–8.
[7] ECF No. 221 at 10, 14.
[8] ECF No. 221 at 10, 14.
[9] ECF No. 221 at 15, 17, 20.
[10] ECF No. 221 at 16–20.
[11] ECF No. 221 at 98.
[12] ECF Nos. 169-50; 141-7; 169-46.

On January 23, 2010, Mahadevan analyzed the results from scientific tests that he ordered Bikkina to complete under his supervision and wrote a technical article on his analysis and emailed the article to Bikkina.[13] Mahadevan further condensed the article into an "abstract" in the body of the email, and sent it to Bikkina on January 25, 2010.[14] Mahadevan claims that the technical article and the abstract that he emailed to Bikkina are original work and that Mahadevan registered copyright for the contents arising from such original works (the "*Copyrighted Works*").[15]

While a student at Tulsa, Bikkina wrote "Contact Angle Measurements of CO2-water-quartz/calcite systems in the perspective of carbon sequestration." ("*Paper #1*"), which was published in International Journal of Greenhouse Gas Control ("*IJGGC*") in July of 2011.[16] Mahadevan claims that Bikkina committed plagiarism and data falsification by using Mahadevan's Copyrighted Work and contaminated data to write and publish Paper #1 without notice or consent of Mahadevan.[17]

To express his concern of scientific misconduct, in April 24, 2011, while Paper #1 was still being considered for publication, Mahadevan sent an email to Stefan Bachu, an associate editor of the IJGGC, stating that the experimental data used in Paper # 1 was likely invalid due to contamination.[18] On April 28, 2011, Stefan Bachu informed Bikkina of the allegations leveled by Mahadevan that Paper #1 may contain false or contaminated data.[19] Publication of Paper #1 was paused, and Bikkina was asked by IJGGC to respond to Mahadevan's allegations.[20]

---

[13] ECF Nos. 169-9; 169-10; 169-11.
[14] ECF No. 169-12.
[15] ECF Nos. 11 at 5; 169-1; 169-2.
[16] ECF Nos. 169-3; 221 at 23.
[17] ECF Nos. 11 at 5-6; 238 at ¶23.
[18] ECF No. 141-7.
[19] ECF No. 141-8.
[20] ECF No. 141-8.

Bikkina admits that while collecting data for Paper #1, he observed marks on one of the samples which was determined to contain Fluorine, but Bikkina did not consider such mark to be significant nor affected other samples and did not believe Paper #1 contained false or contaminated data.[21] Nonetheless, Bikkina allowed Mahadevan to write a paragraph in Paper #1 in which he called out the presence of Fluorine in one of the samples.[22] Bikkina also testified that before leaving Mahadevan's research group, Bikkina offered to credit Mahadevan as a co-author of Paper #1 but Mahadevan declined the offer.[23]

On May 20, 2011, Mahadevan sent an email to a Tulsa administrator stating that he would no longer pursue any allegations of misconduct regarding Paper #1 and that Bikkina was free to publish it as the sole author.[24] However, on June 3, 2011, Mahadevan sent an email to Tulsa administrators claiming he had a right to be a co-author of Paper #1.[25] On June 6, 2011, Roger Blais, the Provost and Vice President for Academic Affairs at Tulsa, sent a letter to Stefan Bachu stating that Tulsa supported the publication of Paper #1 with Bikkina as the sole author.[26]

Paper #1 was resubmitted and published by the IJGGC in July of 2011 with Bikkina as the sole author.[27] The published version of the paper included an additional paragraph, written by Mahadevan, noting the presence of Fluorine in one of the data samples.[28]

On July 22, 2011, Mahadevan filed a complaint against Bikkina under Tulsa's Harassment Policy and Research Misconduct Policy, claiming that Bikkina committed scientific research misconduct through data falsification in Paper #1 and harassed Mahadevan by making false claims

---

[21] ECF No. 221 at 39-40, 204.
[22] ECF Nos. 221 at 33-35, 36, 40; 169-3 at 12.
[23] ECF No. 221 at 26.
[24] ECF No. 141-11.
[25] ECF No. 141-13 at 1, 2.
[26] ECF No. 141-15.
[27] ECF Nos. 169-3; 221 at 91, 120.
[28] ECF Nos. 169-3 at 12; 221 at 35-36.

about him.[29] In response, Bikkina filed his own complaint with Tulsa in July 27, 2011 in which he alleged that Mahadevan wrongly caused him to change dissertation advisors and interfered with the publication of Paper #1.[30]

While still a PhD student at Tulsa, Bikkina authored a second article entitled "Equilibrated Interfacial Tension Data of the CO2-Water System at High Pressures and Moderate Temperatures" ("*Paper #2*"), which was published in the Journal of Chemical & Engineering Data ("*JCED*") in September, 2011.[31] The authors of Paper #2 also included Bikkina's new dissertation advisor, Ovadia Shoham, and Dr. Ramagopal Uppaluri.[32] Bikkina testified that Mahadevan was never offered co-authorship of Paper #2 because Mahadevan told Bikkina not to acknowledge him in any of his publications.[33]

On November 15, 2011, Bikkina received an email from Dr. Ramagopal Uppaluri, forwarding an email of the same date he received from Mahadevan.[34] The email contained a link to Paper #2, and indicated that Mahadevan believed he was entitled to co-authorship on Paper #2.[35] On November 20, 2011, Bikkina submitted a second complaint to Tulsa via email stating Mahadevan harassed Bikkina by sending the email to Dr. Ramagopal Uppaluri.[36]

On November 21, 2011, Mahadevan submitted a hand-written letter to Tulsa indicating his resignation from Tulsa effective December 31, 2011.[37] Mahadevan admitted he resigned from Tulsa mainly because he was unhappy with the outcome of the misconduct complaints he filed

---

[29] ECF No. 141-17 at 4–5.
[30] ECF Nos. 141-16; 221 at 97–98, 103–104.
[31] ECF No. 169-4.
[32] ECF Nos. 221 at 114, 119–120; 222 at 159–161; 169-4.
[33] ECF No. 221 at 122.
[34] ECF No. 141-27.
[35] ECF No. 141-27.
[36] ECF No. 141-29.
[37] ECF No. 141-25.

against Bikkina and because he was denied tenure.[38] On December 1, 2011, Roger Blais wrote a letter to Dr. Ramagopal Uppaluri stating Tulsa's position that Bikkina was not obligated to give Mahadevan co-authorship rights to Paper #2.[39]

On March 16, 2012, after he had left Tulsa, Mahadevan filed another complaint against Bikkina to administrators at Tulsa alleging that Bikkina had falsified Paper #1, and plagiarized Paper #1, Paper #2, and a presentation at Conoco Phillips on November 18, 2009.[40] Similarly, Mahadevan sent an email to administrators at Tulsa on April 19, 2013, stating Bikkina plagiarized part of Paper #1, Paper #2 and his PhD dissertation.[41]

On May 28, 2013, Tulsa issued a memorandum which addressed the cross-complaints made by Bikkina and Mahadevan.[42] In the memorandum, Tulsa found no wrong doing by Bikkina and that Mahadevan had repeatedly violated Tulsa's policies on harassment and ethics.[43] Mahadevan reviewed the memorandum and disagreed with its findings.[44] However, Mahadevan does not remember personally writing to any official at Tulsa to express his disagreement with the memorandum until he sued Tulsa for copyright infringement in 2019.[45]

After graduation from Tulsa in 2013, Bikkina began a post-doctorate fellowship at Lawrence Berkeley National Laboratory ("*LBNL*") in California.[46] In August of 2013, Mahadevan gave a presentation at LBNL, which was attended by Bikkina and other scientists at LBNL.[47]

---

[38] ECF No. 223 at 41–43, 195.
[39] ECF No. 141-30.
[40] ECF No. 141-36 at 2–8.
[41] ECF No. 141-39
[42] ECF No. 141-40.
[43] ECF No. 141-40 at 10.
[44] ECF No. 224 at 88–89, 101.
[45] ECF No. 224 at 88–89.
[46] ECF No. 221 at 162.
[47] ECF Nos. 224 at 98–99; 221 at 161–165.

During the presentation, Mahadevan made reference to Paper #1 and told the audience the data therein was contaminated.[48]

Mahadevan asserted violation of his copyright, moral rights and misappropriation of intellectual property rights through a cease-and-desist letter served on Bikkina on August 26, 2013.[49]

On October 5, 2013, Mahadevan wrote an email to Meredith Montgomery, then Research and Institutional Integrity Officer at LBNL, in which he reiterated his statements that Bikkina engaged in plagiarism and data falsification.[50] Bikkina and other LBNL officials were copied on the email.[51]

Bikkina brought an action against Mahadevan in the Superior Court of the State of California (the "*California Court*") entitled *Bikkina v. Mahadevan*, Alameda Superior Court, Case No. RG14717654 (the "*State Court Action*").[52] Bikkina's complaint in the State Court Action sought damages for (1) libel *per se*; (2) negligence; (3) intentional infliction of emotional distress; and (4) slander *per se*, all on the grounds that Mahadevan published false statements that Bikkina committed scientific misconduct through plagiarism and data falsification.[53] In the State Court Action, by a special verdict rendered February 9, 2018, the jury found Mahadevan liable for negligence, defamation, and intentional infliction of emotional distress.[54]

The jury found that Mahadevan  made the following statements: (a) Bikkina fabricated all or part of Paper #1; (b) Bikkina falsified all or part of Paper #1; (c) Bikkina plagiarized all or part of Paper #1; (d) Bikkina plagiarized all or part of Paper #2; (e) Bikkina plagiarized all or part of

---

[48] ECF No. 221 at 165.
[49] ECF Nos. 169-31 at 6; 169-30 at 7; 169-23.
[50] ECF Nos. 141-43; 221 at 167–168.
[51] ECF Nos. 141-43; 221 at 167–168.
[52] ECF No. 141-1.
[53] ECF No. 141-1.
[54] ECF No. 141-2.

his PhD dissertation; and (e) Bikkina plagiarized all or part of a presentation at Conoco Phillips on November 18, 2009.[55] The jury found each statement to not be "substantially true."[56] The jury awarded Bikkina $461,000 in damages for "Negligence or Intentional Infliction of Emotional Distress" but did not specify how that amount is allocated between negligence and intentional infliction of emotional distress.[57] The jury awarded an additional $315,000 in damages for defamation.[58] The damages thus totaled $776,000.[59] On August 1, 2018, the California Court memorialized the jury's verdict by entering an amended judgment in favor of Bikkina for $776,000 in damages plus allowable case costs and interest (the "*California Judgment*").[60]

Unable to pay the California Judgment, Mahadevan filed for Chapter 13 bankruptcy on February 15, 2018.[61] On March 19, 2018, former Judge David R. Jones granted Mahadevan's motion to dismiss his Chapter 13 case.[62] On February 10, 2021, Mahadevan filed for Chapter 7 bankruptcy in this Court.[63]

On April 14, 2021, Bikkina initiated the instant adversary proceeding.[64] Bikkina asserts that the California Judgement is nondischargeable under 11 U.S.C. § 523(a)(6) because the debt "derive[d] from 'willful and malicious injury.'"[65] Mahadevan moved for summary judgment, arguing that the California Judgment was dischargeable, as a matter of law.[66] Bikkina cross-moved for summary judgment, arguing that collateral estoppel barred Mahadevan from relitigating

---

[55] ECF No. 141-2 at 5.
[56] ECF No. 141-2 at 6.
[57] ECF No. 141-2 at 6–7.
[58] ECF No. 141-2 at 7.
[59] ECF No. 141-2 at 7.
[60] ECF No. 141-2 at 1–2.
[61] Citations to Defendant's previous bankruptcy case no. 18-30675 shall take the form of "Bankr, 18-30675 ECF No. __." Bankr, 18-30675 ECF No. 1.
[62] Bankr, 18-30675 ECF No. 18, 26.
[63] Citations to Defendant's instant bankruptcy case no. 21-30545 shall take the form of "Bankr, 21-30545 ECF No. __." Bankr, 21-30545 ECF No 1.
[64] ECF No. 1.
[65] ECF No 1. at 3.
[66] ECF No. 20.

whether the California Judgment was dischargeable, because the jury in the State Court Action had already determined that Mahadevan's conduct in incurring the debt owed to Bikkina was "willful and malicious."[67] Former Judge David R. Jones held a hearing on the motions and determined that collateral estoppel applied and that the California Judgment against Mahadevan was nondischargeable in Mahadevan's bankruptcy under § 523(a)(6).[68] Former Judge David R. Jones granted summary judgment in favor of Bikkina.[69] Mahadevan appealed.[70]

On appeal, the district court ruled on Mahadevan's argument that the California Judgment was void by the automatic stay, stating that: "[t]he original judgment in the California state action was properly entered under the ministerial principle, and the amended judgment was properly entered after the bankruptcy stay had expired. There is no violation of the stay order."[71] Despite confirming the validity of the California Judgement, the district court reversed the "Judgment On Non-Dischargeability Of Debt Pursuant To 11 U.S.C. § 523(A)(6),"[72] and remanded for further proceedings.[73]

The district court held that Bikkina was not entitled to issue preclusion on the question of Mahadevan's intent because the "evidence that Bikkina has presented to the bankruptcy court— the California state-court jury verdict form, the jury instructions, his complaint, and the final judgment—[were] insufficient to prove Mahadevan's intent" under § 523(a)(6) by a preponderance of the evidence.[74] The district court thus instructed that "[o]n remand, the bankruptcy court must consider this remaining issue of Mahadevan's intent for the purpose of

---

[67] ECF Nos. 19; 23.
[68] ECF No. 38.
[69] ECF No. 38.
[70] ECF Nos. 41; 42.
[71] ECF No. 51 at 10.
[72] ECF No. 38.
[73] ECF No. 51. at 18.
[74] ECF No. 51 at 17.

applying § 523(a)(6)."[75] Specifically, this Court must determine whether Mahadevan "subjectively intended to cause injury or was substantially certain that injury would follow" from his conduct.[76] The district court further instructed that if the Court finds against Mahadevan on the issue of his intent, "the Bankruptcy Court may need to consider whether Mahadevan's actions were 'sufficiently justified under the circumstances'" to render his conduct not willful and malicious.[77] Finally, if the Court finds that Mahadevan acted willfully and maliciously, the Court must determine what portion of the damages awarded in the California Judgement, totaling $776,000, are attributable to such willful and malicious conduct.[78]

The Court now issues this Memorandum Opinion consistent with the district court's instructions on remand.

## II. CREDIBILITY OF THE WITNESSES

It is the Court's duty to assess and weigh the credibility of witnesses.[79] At trial, the Court heard testimony from five witnesses: (a) Mahadevan; (b) Bikkina; (c) Dr. Allan R. Price ("*Dr. Price*"); (d) Dr. Winton Cornell ("*Dr. Cornell*"); and (e) Duc Lee. Each witness responded to questions clearly, completely, and directly.[80] Thus, the Court finds that each witness is credible and gives equal weight to the testimony of each witness.

## III. JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

### A. Jurisdiction and Venue

---

[75] ECF No. 51 at 17.
[76] ECF No. 51 at 17 (quoting *In re Plyam*, 530 B.R. 456, 470 (B.A.P. 9th Cir. 2015)).
[77] ECF No. 51 at 17 (quoting *In re Vollbracht*, 276 F. App'x 360, 362 (5th Cir. 2007)).
[78] ECF No. 51 at 18.
[79] *O'Connor v. Burg* (*In re Burg*), 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc.* (*In re Complaint of Port Arthur Towing Co.*), 42 F.3d 312, 318 (5th Cir. 1995)).
[80] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses in order to make credibility determinations).

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[81] Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[82] This Court determines that pursuant to 28 U.S.C. § 157(b)(2)(I), this proceeding contains core matters as it primarily involves proceedings concerning the dischargeability of particular debts.[83] This proceeding is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.[84]

This Court may only hear a case in which venue is proper.[85] 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." Mahadevan's main bankruptcy case is pending in this Court, and therefore, venue of this proceeding is proper.[86]

**B.  Constitutional Authority to Enter a Final Order**

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only issue reports and recommendations on non-core matters.[87] The determination as to the dischargeability of particular debts pending before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, this Court concludes that the narrow

---

[81] *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).

[82] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[83] *See* 11 U.S.C. § 157(b)(2)(A) & (I).

[84] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987)).

[85] 28 U.S.C. § 1408.

[86] Bankr. 21-30545 ECF No. 1.

[87] *See* 28 U.S.C. §§ 157(b)(1), (c)(1). *See also Stern v. Marshall*, 564 U.S. 462, 480 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015).

limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[88] Thus, this Court wields the constitutional authority to enter a final order here.

## IV. ANALYSIS

Bikkina asserts that the California Judgement in his favor is nondischargeable under § 523(a)(6) because the judgment debt arose from a willful and malicious injury.[89] On remand, the Court must decide whether Mahadevan acted with subjective intent or with substantial certainty to cause harm, and if so, whether Mahadevan's actions were sufficiently justified.[90] If the Court finds that Mahadevan inflicted willful and malicious injury, the Court must also determine what portion of the damages awarded in the California Judgment is attributable to such willful and malicious conduct.[91]

### A. Standard for willful and malicious conduct

Under § 523(a)(6), debts obtained by "willful and malicious injury by the debtor to another entity or to the property of another entity" are not dischargeable in bankruptcy.[92] The Supreme Court has developed guidelines for determining whether a debt arises from a willful and malicious injury under § 523(a)(6).[93] The Supreme Court has held that § 523(a)(6) applies only to "acts done with the actual intent to cause injury" and does not discharge debts arising from negligently or recklessly inflicted injuries.[94]

---

[88] *See, e.g.*, *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547-48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."). *See also Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . We decline to extend *Stern's* limited holding herein.") (citing *Stern*, 564 U.S. at 475, 503, 131).
[89] ECF No. 1.
[90] ECF No. 51 at 17.
[91] ECF No. 51 at 17.
[92] 11 U.S.C. § 523(a)(6).
[93] *In re Williams*, 337 F.3d 504, 508 (5th Cir. 2003) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998)).
[94] *Kawaauhau*, 523 U.S. at 59.

The Fifth Circuit has interpreted the Supreme Court's guidance that 523(a)(6) requires actual intent to cause injury to hold that the "[t]he test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an *objective substantial certainty of harm or a subjective motive to cause harm*' on the part of the debtor."[95]  "Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'"[96]

Bikkina bears the burden of proving that Mahadevan acted with subjective intent to cause harm or with substantially certainty of harm by a preponderance of the evidence.[97]

Finally, if the Court finds that Mahadevan acted with substantial certainty of harm or a subjective motive to cause harm, the conduct is still not willful and malicious unless the Court also finds that the acts were not "sufficiently justified under the circumstances."[98]

## B. Subjective intent to cause harm

To prove subjective intent to cause harm, a creditor must show that a debtor "intend[ed] 'the consequences of an act,' not merely 'the act itself.'"[99] The mere fact a judgment arose from an intentional tort action does not prove that the injury caused by the tortfeasor is willful.[100] The jury in the State Court Action found that Mahadevan was liable for intentional infliction of emotional distress and defamation by making allegations of scientific misconduct against Bikkina[101] Thus, the Court must now decide whether such allegations were made with a subjective intent to injure Bikkina.

---

[95] *In re Williams*, 337 F.3d at 509 (emphasis added).
[96] *In re Vollbracht*, 276 F. App'x 360, 361–62 (5th Cir. 2007).
[97] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).
[98] *In re Vollbracht*, 276 F. App'x at 362.
[99] *Kawaauhau*, 523 U.S. at 61–62.
[100] *Miller v. J.D. Abrams, Inc.* (*In re Miller* ), 156 F.3d 598, 604 (5th Cir.1998).
[101] ECF Nos. 141-1; 141-2; 51 at 10.

Bikkina has presented evidence to show that Mahadevan harbored bitter animosity toward Bikkina.[102] Bikkina and Mahadevan had many disagreements about technical concepts while Bikkina was in Mahadevan's research group.[103] Bikkina testified that before he left the research group, Mahadevan warned him: "Prem, I am going to screw you."[104] Numerous cross complaints with Tulsa between the parties and emails between Mahadevan and Tulsa officials indicate that both of them believed that they were being harassed by the other.[105] For example, Mahadevan emailed Winona Tanaka, a Provost at Tulsa, on June 3, 2011, complaining of Bikini's "malicious acts" and "vengeful behavior."[106] Mahadevan also submitted a complaint on July 22, 2011 to Roger Blais, another Provost at Tulsa, alleging that Bikkina was harassing Mahadevan by making damaging remarks about him to other students and Tulsa officials.[107] Bikkina likewise indicated in a complaint sent to the Vice Provost of Tulsa on July 27, 2011 that Mahadevan had harassed and insulted Bikkina, violating Tulsa's harassment policy.[108]

Although the clear animosity between the parties shows potential motive by Mahadevan to injure Bikkina, such motive in itself does not meet Bikkina's burden of proving that Mahadevan acted with intent to cause harm.[109] In this case, Mahadevan testified that he had no intent to harm Bikkina but only made the allegations of scientific misconduct to prevent infringement of his intellectual property rights, and to inform the public and scientific community about contaminated data in Bikkina's published papers.[110] Moreover, Bikkina was not able to present any witnesses at

---

[102] *See e.g.*, ECF No. 221 at 98.
[103] ECF Nos. 223 at 135; 221 at 39–40, 204.
[104] *See* ECF Nos. 141-16 at 1; 221 at 17.
[105] ECF Nos. 141-13 at 2; 141-17 at 1; 141-36.
[106] ECF No. 141-13 at 2.
[107] ECF No. 141-17 at 1.
[108] ECF No. 141-16.
[109] *See In re Vollbracht*, 276 F. App'x at 361–62.
[110] June 5, 2024 Courtroom Trial (Jagannathan Mahadevan testifying); Aug. 20, 2024 Courtroom Trial (Jagannathan Mahadevan testifying); ECF No. 11.

trial to corroborate Bikkina's testimony that Mahadevan made incriminating remarks to Bikkina, such as "I am going to screw you."[111]

Accordingly, this Court finds that Bikkina has not met his burden of showing that Mahadevan acted with subjective intent to injure Bikkina by making allegations of scientific misconduct.

## C. Substantial certainty of harm

The Fifth Circuit recognizes that since a debtor generally denies having a subjective motive to injure a plaintiff, "[i]ntent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury."[112] Indeed, actions taken with substantial certainty of harm are "badges of intent" by a debtor.[113] In other words, when "the [d]efendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, . . . the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the Plaintiff."[114]

An objective test, such as the substantial certainty of harm test under § 523(a)(6) requires an assessment of all of the relevant facts and circumstances.[115] The Fifth Circuit recognizes that a debtor's knowledge at the time of the act that caused the injury is an important factor in determining whether the injury was substantially certain to result from the debtor's actions.[116] Specifically, the debtor must have knowledge of the particular circumstances present at the time of injury that would

---

[111] Aug. 20, 2024 Courtroom Trial (Duc Lee testifying); ECF No. 141-16 at 1.
[112] *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir.1998); *In re Vollbracht*, 276 F. App'x at 361–62 ("Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so by determining whether '[the debtor's] actions were at least substantially certain to result in injury.'").
[113] *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009) ("The court agrees with *Vollbracht* and its reading of the objective prong as a direction to lower courts to attend to 'badges of intent' that may be evidenced by actions having a substantial certainty to result in harm.")
[114] *In re Kahn*, 533 B.R. 576, 588 (Bankr. W.D. Tex. 2015).
[115] *In re D'Amico*, 509 B.R. 550, 558 (S.D. Tex. 2014).
[116] *Id.* at 559.

enable the debtor to be aware of the substantial certainty of harm.[117] The creditor has the burden to prove by a preponderance of the evidence that the debtor possessed the requisite knowledge to make his acts substantially certain to result in injury.[118]

Substantial certainty of harm does not mean "absolute certainty," but it is a higher standard than recklessness.[119] Unlike recklessness, "[s]ubstantial certainty . . . requires more than a realization that there is a strong probability that harm may result."[120] Even a "high probability is less than substantial certainty."[121] Thus, as applied to this case, the Court must decide whether the probability of injury to Bikkina from Mahadevan's allegations, in light of all the relevant facts and circumstances, was so high as to constitute substantial certainty rather than mere recklessness or negligence.[122]

For the defamation judgement arising from the State Court Action to be non-dischargeable under § 523(a)(6), Mahadevan must have acted with substantial certainty that his allegations of scientific misconduct were false, and he must have spread them knowing they would harm Bikkina.[123] Mahadevan has consistently asserted that he believes that Bikkina plagiarized his research.[124] However, Mahadevan was informed several times by different officials at Tulsa that Bikkina committed no wrong doing and that Mahadevan waived his rights to any potential

---

[117] *Id.* at 558; *See Walker*, 142 F.3d at 815–16, 824 (reversing district court's grant of judgement as a matter of law on the issue of non-dischargeabiilty under 523(a)(6) with regard to debt arising from breach of contract and conversion claims because a genuine issue of fact remained as to whether the debtor knew that his retention of professional fees was a breach of his contractual obligation to remit the professional fees to the creditor).
[118] *In re D'Amico*, 509 B.R. at 564.
[119] *Id.* at 561.
[120] *Id.* at 562.
[121] *Id.* at 563 (citing *In re Conte*, 33 F.3d 303, 307 (3d Cir. 1994)).
[122] *Id.*
[123] *In re Mahadevan*, 617 F. Supp. 3d 654, 664 (S.D. Tex. 2022); *In re Marshall*, 264 B.R. 609, 630 (C.D. Cal. 2001) ("Libel and defamation claims are nondischargeable under § 523(a)(6) when the statements were made with actual knowledge of their falsity."); *In re Mason*, 1999 WL 58579, at *3 (Bankr. S.D.N.Y. 1999) ("The intentional tort of defamation may constitute 'willful and malicious injury' by the debtor to another entity under § 523(a)(6) of the Bankruptcy Code, as long as the debtor knew the published statements were false.").
[124] *See* ECF No. 11; June 5, 2024 Courtroom Trial (Jagannathan Mahadevan testifying); Aug. 20, 2024 Courtroom Trial (Jagannathan Mahadevan testifying).

authorship rights to Bikkina's work.[125] For example, Tulsa issued a memorandum, which Mahadevan reviewed, stating that Tulsa found no scientific misconduct by Bikkina.[126] Mahadevan himself even sent an email to a Tulsa administrator stating that he would no longer pursue any allegations of misconduct regarding Paper #1 and that the Bikkina was free to publish it as the sole author.[127] Bikkina also credibly testified that he offered to credit Mahadevan as a co-author of Paper #1 but that Mahadevan declined the offer.[128]

Accordingly, the Court finds that by making allegations of plagiarism even after being informed that he no longer had co-authorship rights and representing to Tulsa administrator and to Bikkina that he waived such rights, Mahadevan knew with substantial certainty that his allegations of plagiarism were false.[129]

As to the claims of data falsification, Mahadevan has presented testimony from Dr. Cornell to confirm that one of the research samples included in Paper #1 did indeed contain Fluorine.[130] However, Bikkina included a paragraph, written by Mahadevan, in Paper #1 indicating the presence of Fluorine contamination in one of the research samples.[131] Mahadevan himself originally agreed to withdraw his complaint against Bikkina after he wrote this additional paragraph in Paper #1.[132] Mahadevan continued his allegations of data falsification even after IJGGC, with the approval of Tulsa, published Paper #1 with the additional paragraph.[133]

Accordingly, the Court finds that the Mahadevan knew with substantial certainty that Paper #1 did not contain false or fabricated data when he made the allegations of data falsification. The

---

[125] *See e.g*, ECF Nos. 141-30; 141-40.
[126] ECF Nos. 141-40 at 10; 224 at 88–89, 101.
[127] ECF No. 141-11.
[128] ECF No. 221 at 26.
[129] *See* e.g., ECF Nos. 141-11;141-40.
[130] ECF No. 169-47; Aug. 20, 2024 Courtroom Trial (Dr. Winton Cornell testifying).
[131] ECF Nos. 141-15; 169-3; 221 at 33-40.
[132] ECF Nos. 141-15; 169-3; 221 at 33-40; 141-11.
[133] ECF Nos. 141-15; 169-3 at 12; 141-36 at 2–8.

Court further finds that Mahadevan knew that the allegations of plagiarism and data falsification would harm Bikkina when he made them since they affected Bikkina's livelihood as a scientist.[134] Indeed, Mahadevan was a scientist himself who appreciated that the reputation of a scientist depends on his truthfulness and accuracy of his scientific research.[135] Thus, since Mahadevan knew his allegations of scientific misconduct were not substantially true and that such allegations would harm Bikkina when he made them, Mahadevan acted with substantial certainty of harm when he defamed Bikkina.[136]

As to intentional infliction of emotional distress, the jury in the State Court Action found that Mahadevan engaged in outrageous conduct, which caused severe emotional distress to Bikkina.[137] The jury did not expressly indicate what conduct was outrageous.[138] However, Bikkina credibly testified that discovery of allegations of scientific misconduct made him suffer emotional distress.[139] Bikkina's complaint in the State Court Action also makes references to discovery of the same allegations as the basis for intentional infliction of emotional distress.[140]

Accordingly, the Court thus finds, based on the complaint in the State Court Action and evidence presented, that the outrageous conduct was attributed to Mahadevan's repeated allegations of scientific misconduct made to Bikkina's peers and superiors.

California "law limits claims of intentional infliction of emotional distress to egregious conduct *toward Plaintiff* proximately caused by defendant."[141] Here, Mahadevan reached out to

---

[134] *See In re Sligh*, No. 21-30915-SGJ7, 2022 WL 1101537, at *5 (Bankr. N.D. Tex. Apr. 12, 2022) ("[F]alse statements that may affect the victim's livelihood . . . are of such a nature and so egregious that both injury and intent may properly be inferred for purposes of section 523(a)(6), as those acts are substantially certain to cause harm.").

[135] ECF No. 223 at 37–38.

[136] *See In re Mahadevan*, 617 F. Supp. 3d 654, 664 (S.D. Tex. 2022).

[137] ECF No. 141-2 at 4.

[138] ECF No. 141-2.

[139] *See e.g.*, ECF No. 221 at 113–18, 143–46, 165.

[140] ECF No. 141-1.

[141] *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 905, 820 P.2d 181, 203–04 (1991) (emphasis in original).

IJGGC asserting that Paper #1 contained falsified data.[142] After that failed to prevent publication, Mahadevan contacted administrators at Tulsa, and Bikkina's co-author in Paper #2 to assert allegations of plagiarism in Paper #2 and data falsification in Paper #1.[143] After Tulsa rejected his allegations that Paper # 1 and Paper # 2 were plagiarized or contained false data, Mahadevan, knowing that Bikkina was attending LBNL, alleged that Paper #1 contained contaminated data at a presentation at LBNL.[144] Mahadevan later sent an email to administers at LBNL and Bikkina, making the same previously rejected allegation of scientific misconduct.[145]

Accordingly, this Court finds that this pattern evidences that Mahadevan directed his conduct towards Bikkina by intentionally spreading the allegations to institutions and individuals who Mahadevan knew had direct influence over Bikkina's career and reputation as a scientist.[146] The Court also finds that Mahadevan knew it was substantially certain that such repeated allegations would cause emotional distress because a reasonable person would know that allegations of scientific misconduct would tarnish Bikkina's reputation for truth and honesty in front of his peers and superiors in his scientific community and cause fear of losing his occupation.[147] As such, Mahadevan acted with substantial certainty of harm when he inflicted emotional distress on Bikkina.

Therefore, the Court finds that Mahadevan acted with knowledge that his actions were substantially certain to injure Bikkina when he defamed and inflicted emotional distress upon Bikkina.

### D.  Sufficiently justified under the circumstances

---

[142] ECF No. 141-7.
[143] ECF Nos. 141-15; 141-17 at 4–5; 141-27.
[144] ECF Nos. 224 at 96–100; 221 at 161–65.
[145] ECF Nos. 141-43; 221 at 167–69.
[146] *See* ECF No. 223 at 37–38.
[147] *See In re Sligh*, No. 21-30915-SGJ7, 2022 WL 1101537, at *5 (Bankr. N.D. Tex. Apr. 12, 2022); *In re Kahn*, 533 B.R. 576, 588 (Bankr. W.D. Tex. 2015).

The "substantially justified" exception is an "expansive affirmative defense."[148] The Fifth Circuit teaches that even if an affirmative defense under state law, such as self-defense in criminal law, is not available, a debtor's actions may still be deemed "sufficiently justified" to render it not "willful and malicious."[149] Whether a debtor's acts were "sufficiently justified" under the circumstances is a question that requires discretion and fact-finding.[150]

Mahadevan has not pled any plausible affirmative defense under applicable state law to justify harming Bikkina by making allegations of scientific misconduct.[151] Thus, the Court must make an examination into the facts and use its discretion to determine whether Mahadevan was sufficiently justified in knowingly inflicting injury upon Bikkina.[152] Mahadevan has repeatedly asserted his belief that his allegations were true, particularly that Bikkina committed copyright infringement.[153] The Court has already found that this belief was clearly misplaced in light of all the evidence supporting the falsity of the allegations.[154]

Moreover, Mahadevan's repetition of his allegations, even after rejected by individuals having authority to evaluate the allegations, was an unreasonable method of protecting his alleged authorship rights.[155] If Mahadevan believed that his copyrighted work was being plagiarized, he could have protected his authorship rights by pursuing legal action against Bikkina.[156] In fact, Mahadevan served a cease and desist letter on Bikkina in August of 2013 asserting copy right infringement; registered copy rights for work that Bikkina allegedly plagiarized in 2019; and sued

---

[148] *Wise v. Peterson (In re Peterson)*, 452 B.R. 203, 233 (Bankr. S.D. Tex. 2011) (citing *In re Vollbracht*, 276 F. App'x at 362 n.8).
[149] *In re Vollbracht*, 276 F. App'x at 363 n.8.
[150] *Arguello v. LaFavers*, 448 F. Supp. 3d 655, 666 (S.D. Tex. 2020).
[151] *See* ECF Nos. 11; 32.
[152] *Arguello*, 448 F. Supp. 3d at 666.
[153] June 5, 2024 Courtroom Trial (Jagannathan Mahadevan testifying); ECF Nos. 11; 32.
[154] *See* discussion *supra* Section IV.C.
[155] *See e.g.*, ECF No. 141-40. *See also* discussion *supra* Section IV.C.
[156] *See Mahadevan v. Bikkina*, No. 20-CV-536-GKF-JFJ, 2021 WL 232126, at *6 (N.D. Okla. Jan. 22, 2021); 17 U.S.C. § 501.

Bikkina in July of 2020 in the Northern District of Oklahoma for copyright infringement.[157] However, these legal actions were not initiated until after Mahadevan already made his allegations of plagiarism to individuals at Tulsa and LBNL.[158] Dr. Cornell and Dr. Price testified that Tulsa never conducted a complete investigation into Mahadevan's complaints before concluding that Bikkina committed no wrongdoing.[159] However, Mahadevan does not even remember writing to Tulsa to express his disagreement with the handling of his complaints before repeating allegations of scientific misconduct at an LBNL presentation.[160] Thus, the Court cannot find that Mahadevan's decision to take matters into his own hands, by asserting serious allegations against Bikkina without having a reasonable basis for believing that the allegations were true, rises to the level of sufficient justification contemplated in *Vollbracht*.[161]

Accordingly, the Court finds that Mahadevan was not sufficiently justified under the circumstances when he acted with substantial certainty of harm to defame and inflict emotional distress upon Bikkina.

### E.  Portion of damages attributable to willful and malicious injury

In the State Court Action, $461,000 in damages was awarded to Bikkina for "Negligence or Intentional infliction of Emotional Distress," and $315,000 was awarded for defamation.[162] Under California law, a plaintiff  may seek damages under more than one legal theory, but "each item of damages may be awarded only once, regardless of the number of legal theories alleged."[163]

---

[157] ECF Nos. 169-31 at 6; 169-30 at 7; 169-23; 169-1;169-2; 51 at 3; Bankr, 21-30545 ECF No. 13 at 9.

[158] ECF Nos. 169-31 at 6; 169-30 at 7; 169-23; 169-1;169-2; 141-40; 141-43.

[159] Aug. 20, 2024 Courtroom Trial (Dr. Alan Price testifying); Aug. 20, 2024 Courtroom Trial (Dr. Winton Cornell testifying).

[160] ECF No. 224 at 88–89.

[161] *In re Wilhite*, No. 16-10632-JDW, 2017 WL 835764, at *9 (Bankr. N.D. Miss. Mar. 1, 2017) ("Debtor firmly believed that the Creditor had neglected its contractual duties. . . . Her subjective belief . . . was clearly misplaced given the plain language of the Performance Agreement. Such confusion, by itself, does not rise to the level of sufficient justification contemplated in *Vollbracht*.").

[162] ECF No. 141-2 at 6–8.

[163] *In re Zeeb*, BAP No. CC-19-1019, 2019 WL 3778360, at *8 n.4 (B.A.P. 9th Cir. Aug. 9, 2019).

Thus, when the jury in the State Court Action awarded Bikkina $461,000 for "economic damages for past wage loss" and "past noneconomic loss," the jury found that he was entitled to damages for both his negligence claim and his intentional infliction of emotional distress claim.[164] The Court must now decide what portion of that $461,000 is attributed to willful and malicious conduct.[165]

Here, Mahadevan's allegations against Bikkina that he committed plagiarism or data falsification in Paper #1, Paper #2, his PhD dissertation and a Conoco Phillips presentation made Mahadevan liable to Bikkina for defamation.[166] These allegations also made Mahadevan liable for intentional infliction of emotional distress.[167] This Court has found that Mahadevan acted more than negligent or reckless as Mahadevan made these allegations with substantial certainty of harm and that there was no sufficient justification to render Mahadevan's conduct not willful and malicious.[168] The Court also finds, given the severity of the allegations of scientific misconduct made by Mahadevan to third parties, which created an objective substantial certainty of harm to Bikkina, that Mahadevan injured Bikkina in an amount at least equivalent to the judgement amount in the State Court Action.[169]

Accordingly, since Mahadevan was willful and malicious in inflicting emotional distress on Bikkina and was also willful and malicious in defaming Bikkina, Mahadevan's judgement debt owed to Bikkina as set forth in the California Judgement in the amount of $776,000 is excepted from discharge as a debt for a willful and malicious injury to another entity or to the property of another entity pursuant to 11 U.S.C. § 523(a)(6).[170]

---

[164] ECF No. 51 at 19.
[165] *See* ECF No. 151 at 17–19.
[166] ECF No. 141-2.
[167] ECF Nos. 141-1; 141-2. *See also* discussion *supra* Section IV.C.
[168] *See* discussion *supra* Section IV.C, IV.D.
[169] *McClendon v. Springfield*, 505 B.R. 786, 792 (E.D. Tex. 2013), aff'd sub nom. *In re McClendon*, 765 F.3d 501 (5th Cir. 2014) ("[T]he Court finds that the bankruptcy court did not err by not individually determining which damages were non-dischargeable because it found that all of the damages were non-dischargeable.").
[170] ECF No. 141-2 at 5–8.

## V. Conclusion

The Court will enter a judgment consistent with this Memorandum Opinion.


SIGNED February 21, 2025


_____
Eduardo V. Rodriguez
Chief United States Bankruptcy Judge