United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 26, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE JAGANNATHAN MAHADEVAN, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| _____ | § | |
| | § | |
| JAGANNATHAN MAHADEVAN | § | CIVIL ACTION NO. H-25-901 |
| | § | BANKRUPTCY CASE NO. 21-30545 |
| | § | ADV. PROCEEDING NO. 21-03054 |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | |
| | § | |
| PREM BIKKINA, | § | |
| | § | |
| Appellee. | § | |

### MEMORANDUM AND OPINION

In February 2018, Prem Bikkina obtained a $776,000 judgment in California state court against Jagannathan Mahadevan on claims of negligence, defamation, and intentional infliction of emotional distress. Mahadevan filed for bankruptcy. Bikkina initiated an adversary proceeding, arguing that the state-court judgment was a nondischargeable debt under 11 U.S.C. § 523(a)(6), because the debt was "for [a] willful and malicious injury by [Mahadevan] to [Bikkina]." 11 U.S.C. § 523(a)(6).

This is the second time the parties' long-running disputes have reached this court. Previously, Mahadevan appealed the bankruptcy court's determination that issue preclusion compelled the conclusion that the state-court judgment was nondischargeable. This court reversed, holding that issue preclusion did not resolve the dischargeability question, and remanded to the bankruptcy court to determine whether § 523(a)(6)'s exception applied. *In re Mahadevan (Mahadevan I)*, 617 F. Supp. 3d 654, 667 (S.D. Tex. 2022). On remand, the bankruptcy court held

a bench trial; found that "Mahadevan was willful and malicious in inflicting emotional distress on Bikkina and was also willful and malicious in defaming Bikkina"; and concluded that "the California state-court judgment . . . is excepted from discharge as a debt . . . pursuant to 11 U.S.C. § 523(a)(6)." *In re Mahadevan (Mahadevan II)*, 668 B.R. 138, 142 (Bankr. S.D. Tex. 2025).

This is Mahadevan's appeal from that judgment.  Based on a thorough review of Mahadevan's brief; the response; the reply; the bankruptcy court's opinion; the record; and the applicable law, the bankruptcy court's judgment is affirmed and this appeal is dismissed.  The reasons for this ruling are set forth below.

## I.    Background[1]

Mahadevan was a professor, and Bikkina a graduate student, at the University of Tulsa.  Mahadevan was Bikkina's dissertation advisor from 2007 to 2010, when Bikkina was assigned a new advisor.  The reassignment came after Bikkina complained that Mahadevan was intentionally delaying his progress toward his Ph.D.

In January 2010, Mahadevan analyzed the results from scientific tests that he had ordered Bikkina to complete under his supervision and wrote a technical article on his analysis.  He emailed Bikkina the article and an abstract.  Bikkina later wrote an article, "Contact Angle Measurements of CO2-water-quartz/calcite systems in the perspective of carbon sequestration," which was published in the International Journal of Greenhouse Gas Control ("IJGGC") in July 2011.  Mahadevan alleges that this article was plagiarized from his original work, published without his notice or consent, and based on contaminated samples.

Mahadevan sent an email to an associate editor at the IJGGC, stating that the article's findings were likely invalid due to fluorine contamination.  The IJGGC paused the publication of

---

[1] This background is based on the bankruptcy court's factual findings, which are not clearly erroneous.

the article, relayed the concerns to Bikkina, and asked for his response.  Bikkina admitted that he had observed marks on the samples that contained fluorine but explained that they were not significant and did not materially impact the paper's findings.  Bikkina allowed Mahadevan to write a paragraph to insert into the paper identifying the presence of fluorine in one of the samples and offered to credit Mahadevan as a co-author.

In May 2011, Mahadevan considered the matter resolved and sent an email to a University of Tulsa administrator stating that he would no longer pursue misconduct charges and that Bikkina could publish as the sole author.  But in June 2011, Mahadevan sent an email to a University of Tulsa administrator claiming that he had the right to be listed as a co-author with Bikkina.  Roger Blais, the Provost and Vice President for Academic Affairs at the University, sent a letter to the IJGGC supporting the publication of the paper with Bikkina as a sole author.  The IJGGC published the paper with Bikkina as the sole author the next month.

In July 2011, Mahadevan filed a complaint against Bikkina under the University of Tulsa's Harassment Policy and Research Misconduct Policy, reiterating his earlier plagiarism and data-falsification complaints.  Bikkina responded with his own complaint shortly afterwards, claiming that Mahadevan had falsely accused him of wrongdoing and interfered with the paper's publication.

In September 2011, Bikkina published a second article, "Equilibrated Interfacial Tension Data of the CO2-Water System at High Pressures and Moderate Temperatures," in the Journal of Chemical & Engineering Data ("JCEG").  Bikkina co-authored the paper with his new dissertation advisor, Ovadia Shoham, and another researcher, Ramagopal Uppaluri.  Bikkina did not include Mahadevan as a co-author because Mahadevan told Bikkina not to acknowledge him in any of his publications.  But in November 2011, Bikkina received an email from Uppaluri that forwarded an

email from Mahadevan requesting a link to this second paper and explaining that he should be listed as a co-author on it. Bikkina forwarded the email to the University as part of a second harassment complaint against Mahadevan.

That month, after Bikkina submitted the second harassment complaint, Mahadevan submitted a resignation letter to be effective on December 31, 2011. Mahadevan resigned because he was unhappy with the outcome of his misconduct complaints against Bikkina and because he was denied tenure. In December 2011, Blais wrote a letter to Uppaluri stating the University's position that Bikkina was not obligated to give Mahadevan co-authorship rights.

After Mahadevan left the University, he did not stop filling complaints against Bikkina. He filed another complaint in March 2012, alleging that Bikkina had falsified the first paper, plagiarized both papers, and also plagiarized a presentation at Conoco Phillips in November 2009. In April 2013, Mahadevan sent an email to administrators at the University, claiming that Bikkina plagiarized both papers and his dissertation.

On May 28, 2023, the University issued a memorandum that addressed the complaints. The University found no wrongdoing by Bikkina and found that Mahadevan had repeatedly violated its policies on harassment and ethics. Mahadevan reviewed the memorandum and disagreed with its findings but does not remember challenging the findings until he sued the University for copyright infringement in 2019.[2]

After graduating from the University, Bikkina began a post-doctorate fellowship at the Lawrence Berkeley National Laboratory in California. In August 2013, Mahadevan gave a

---

[2] The transcript reflects that Mahadevan at first did not recall disputing the memorandum's findings but then remembered that his lawyer sent a notice to the University to dispute the memorandum sometime in 2014, although he could not recall the exact date when his lawyer did so. (A.P. Docket Entry No. 224 at 88:23–89:9). The bankruptcy court found that Mahadevan did not dispute the letter until 2019, and this court must defer to its assessment of Mahadevan's memory and credibility. *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1523 (5th Cir. 1994).

presentation at the National Laboratory.  Bikkina and other scientists attended.  During the presentation, Mahadevan referred to the first of Bikkina's two published papers and told the audience that the data used as the basis for the paper had been contaminated.  That same month, Mahadevan sent a cease-and-desist letter to Bikkina, asserting violations of his copyright and moral rights and misappropriation of intellectual property.  In October 2013, Mahadevan sent an email to Meredith Montgomery, the Research and Institutional Integrity Officer at the National Laboratory, in which he reiterated his statements that Bikkina had committed plagiarism and data falsification.  Mahadevan copied Bikkina and other National Laboratory officials on the email.

Bikkina sued Mahadevan in California state court, asserting claims of negligence, defamation, and intentional infliction of emotional distress, and seeking compensatory and punitive damages.  A jury awarded Bikkina $776,000 in compensatory damages and found that Bikkina was entitled to punitive damages.  The jury did not determine the amount of punitive damages because Mahadevan agreed to waive his right to appeal the judgment in exchange for Bikkina waiving his claim to punitive damages.

On February 15, 2018, a few days after the jury verdict but before the state court entered judgment, Mahadevan filed a petition for Chapter 13 bankruptcy in the Southern District of Texas, generating an automatic stay order. That same day, but a few hours after Mahadevan filed for bankruptcy, the California state court entered judgment.  The automatic stay expired on March 19, 2018, when Mahadevan moved to dismiss his bankruptcy proceedings. On August 1, 2018, the California state court entered an amended judgment awarding Bikkina $790,256.88 in actual damages plus costs and postjudgment interest.

In February 2021, Mahadevan filed for Chapter 7 bankruptcy.  Bikkina initiated this adversary proceeding, asserting that the California judgment was nondischargeable under 11

U.S.C. § 523(a)(6) because the judgment debt derived from willful and malicious injury.   The parties cross-moved for summary judgment.   The bankruptcy court granted Bikkina's motion for summary judgment, concluding that the California jury had found that Mahadevan's conduct was willful and malicious.   This court reversed, explaining that issue preclusion did not compel a finding that Mahadevan's conduct was willful and malicious, and remanded to the bankruptcy court for further proceedings.

On remand, the bankruptcy court found that, although Mahadevan did not "act[] with subjective intent to injure Bikkina by making allegations of scientific misconduct," he "acted with knowledge that his actions were substantially certain to injure Bikkina when he defamed and inflicted emotional distress upon Bikkina." *Mahadevan II*, 668 B.R. at 150, 153.   The bankruptcy court also found that Mahadevan's conduct was not substantially justified.   *Id.* at 154.   The bankruptcy court found that Mahadevan's repeated allegations against Bikkina were "clearly misplaced in light of all the evidence supporting the falsity of the allegations."   *Id.*   The court emphasized that "Mahadevan's repetition of his allegations, even after rejected by individuals having authority to evaluate the allegations, was an unreasonable method of protecting his alleged authorship rights."   *Id.*   The bankruptcy court found that the California jury award of $776,000 was attributable to misconduct that "created an objective substantial certainty of harm to Bikkina." *Id.* at 155.   It concluded that the "the California Judgement in the amount of $776,000 is excepted from discharge" under § 523(a)(6).   *Id.*

Mahadevan timely appealed.

## II.   The Legal Standard

Traditional appellate standards apply to the district court's review on an appeal from a bankruptcy court's judgment or order under 28 U.S.C. § 158(a).   *Stern v. Marshall*, 564 U.S. 462,

475 (2011).   This court reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo.  *In re Williams*, 337 F.3d 504, 508 (5th Cir. 2003).  Clear-error review is highly deferential; "[a] finding that is plausible in light of the full record—even if another is equally or more so—must govern."  *Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1225 (11th Cir. 2025) (per curiam) (citation omitted); *Cooper v. Harris*, 581 U.S. 285, 293 (2017).  The bankruptcy court's interpretation of § 523(a)(6) is a question of law and is reviewed de novo.  *In re Williams*, 337 F.3d at 508; *see also In re Hickman*, 260 F.3d 400, 401 (5th Cir. 2001).

## III.   Analysis

Mahadevan argues that this court should vacate the bankruptcy court's judgment for four reasons.  First, he argues that the bankruptcy court made several procedural and evidentiary errors in the below proceedings that warrant reversal.  (Docket Entry No. 13 at 28–40).   Second, Mahadevan argues that the bankruptcy court erred in concluding that the state-court judgment was dischargeable after it found that Mahadevan did not act with subjective intent to injure Bikkina.  (*Id.* at 40–44).  Third, Mahadevan argues that the bankruptcy court erred in finding that there was an objectively substantial certainty of harm because Bikkina did not introduce "explicit evidence," as required by Fifth Circuit precedent.  (*Id.* at 44–56).  Fourth, Mahadevan argues that his conduct was substantially justified as a professor and citizen concerned about public safety and academic integrity.  (*Id.* at 57–61).  None of Mahadevan's arguments warrants reversal.

A.        **Procedural and Evidentiary Objections**

1.        **Insufficient Complaint**

Mahadevan argues that the bankruptcy court's ruling must be reversed because Bikkina failed to state a claim in his adversary-proceeding complaint.  (Docket Entry No. 13 at 28–32). This argument fails.

A denial of a motion to dismiss for failure to state a claim is generally not appealable. *Solorzano v. Mayorkas*, 987 F.3d 392, 396 (5th Cir. 2021).   This posture is no different. Mahadevan argues that Bikkina's complaint alleging the dischargeability of his state-court judgment failed to state a claim and that the bankruptcy court erred by permitting his claims to proceed to trial.  That last part is the key: the bankruptcy court's ruling was a "preliminary step in some phase of the bankruptcy proceeding," *In re Delta Servs. Indus.*, 782 F.2d 1267, 1270 (5th Cir.1986), and merely "allowed the proceedings to continue going forward," without resolving the "discrete issue in the Adversary Proceeding or the main bankruptcy case," *Smith v. AET Inc., Ltd.*, No. 07-cv-123, 2007 WL 1644060, at *4 (S.D. Tex. June 4, 2007).  The alleged inadequacy of Bikkina's complaint is not a ground to disturb the bankruptcy court's judgment after trial.

To the extent Mahadevan argues that Bikkina's complaint failed to give him adequate notice of the claims, this argument also fails.  In 2022, when this court resolved the first appeal, it laid out in detail the issues that the bankruptcy court needed to address on remand.  *Mahadevan I*, 617 F. Supp. 3d at 666.  The bankruptcy court tried those issues throughout 2024.  By the time this trial occurred, the parties had hurled accusations at each other for years, and Mahadevan had years to prepare.  Mahadevan had ample notice of the claims and issues.  He is not entitled to relief on this ground.

### 2.    Untimely Disclosed Evidence

Mahadevan argues that Bikkina failed to disclose his trial evidence before the close of discovery, leading to a trial by surprise.  (Docket Entry No. 13 at 32–34).  Mahadevan argues that Bikkina should have disclosed his trial evidence before the first round of summary-judgment motions.  (*Id.*).  "An error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant."  *United States v. Dukes*, 139 F.3d 469, 476 (5th Cir. 1998).  "[T]he purpose of Rules 26 and 37 is to avoid surprise and prevent trial by ambush."  *DP Wagner Mfg. Inc. v. Pro Patch Sys., Inc.*, 434 F. Supp. 2d 445, 463 (S.D. Tex. 2006).  Mahadevan has identified neither surprise nor prejudice.  Mahadevan raised these objections before the bankruptcy court in September 2022.  (A.P. Docket Entry No. 59 at 2–3).[3]  He opposed Bikkina's request to reopen discovery and to rely on evidence not previously disclosed.  (*Id.* at 2–5).  When the bankruptcy court allowed the parties to place "new" evidence and witnesses on their exhibit and witness lists but declined to reopen discovery, Mahadevan did not pivot and request discovery on this evidence.  (A.P. Docket Entry No. 60).  Instead, he reiterated that the Rules categorically barred Bikkina's reliance on this "new" evidence.  (*See id.*).

Bikkina disclosed his evidence and witnesses to Mahadevan in October 2022 and made additional disclosures in amended exhibit and witness lists in December 2022, in compliance with the bankruptcy judge's orders.  (*See* A.P. Docket Entry No. 106 at 3–4).  After receiving Bikkina's disclosures, Mahadevan maintained for over a year that the bankruptcy court should exclude the evidence.  He did not request discovery when the bankruptcy court continued the trial in January 2023.  (A.P. Docket Entry No. 83).  Nor did he do so in November 2023, when he renewed his

---

[3] The Adversary Proceeding docket is found at *Bikkina v. Mahadevan*, Case No. 21-ap-03054 (Bankr. S.D. Tex.).

motion to exclude the late exhibits. (A.P. Docket Entry No. 96). The trial took place during 2024. Mahadevan has not pointed to a place in the record where he identified a need for additional discovery to prepare for trial. (Docket Entry No. 13 at 32–34). He instead repeatedly used Bikkina's September 2022 request for additional discovery as a sword to limit Bikkina's case, (*see, e.g.*, A.P. Docket Entry No. 103 at 3), without arguing that the court unfairly prejudiced him by denying that request. Mahadevan had the opportunity to avoid the alleged prejudice he complains about. He did not.

Mahadevan has neither presented nor pointed to evidence that Bikkina's late disclosures were unfairly prejudicial. The record reflects that any discovery violations were "harmless." FED. R. CIV. P. 37(c)(1); *see Davis v. Napper*, No. 93-4087, 1994 WL 574399, at *4 (5th Cir. Oct. 6, 1994) ("Errors in discovery rulings may be subject to harmless-error analysis."). Substantially all the evidence supporting the bankruptcy court's findings of fact date from the late 2000s to the early 2010s. *See Mahadevan II*, 668 B.R. at 142–46. The parties had tried their disputes before a jury in California state court, using the same evidence that they relied on in the bankruptcy court and cite to this court. *See id.* at 145–46 (describing the jury verdict). Mahadevan does not identify in his briefs specific witness testimony or exhibits that surprised or ambushed him. (Docket Entry No. 13 at 32–34). Bare assertions of prejudice, (*see* Docket Entry No. 13 at 33–34), are not enough. *See United States v. Regan*, 832 F. App'x 898, 899 (5th Cir. 2021) (per curiam). Mahadevan does not explain how he was unable to defend himself at trial because of surprise evidence, as he alleges. *See, e.g.*, *United States v. Holmes*, 406 F.3d 337, 357 (5th Cir. 2005). In short, Mahadevan has not shown that "reversing and requiring" a discovery period would "serve[]" a "purpose" and lead to a different outcome. *Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 136 (5th Cir. 1987).

Neither the bankruptcy court's denial of Mahadevan's motion to exclude nor its decision to forgo an additional discovery period warrants reversal.

### 3.    Hearsay and Authenticity Objections

Mahadevan argues that the district court erroneously admitted into evidence several exhibits under Federal Rule of Evidence 803(3), the state-of-mind hearsay exception.  (Docket Entry No. 13 at 34–38).  He argues that these exhibits were not authenticated and did not fit within that hearsay exception.  Mahadevan identifies as the most egregious violation the admission into evidence of Exhibit 141-40, (*id.* at 36–38), the memorandum in which the University of Tulsa found no wrongdoing by Bikkina and found that Mahadevan had repeatedly violated the University's policies on harassment and ethics.  *See Mahadevan II*, 668 B.R. at 145 & n.43.

Mahadevan is technically correct that the evidence does not satisfy the state-of-mind exception, but that is not enough to reverse the bankruptcy court's ruling or judgment.  Rule 803(3) does not apply to the memorandum, or many of the other exhibits at issue.  That rule excepts from the bar on hearsay statements of the "declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)."  FED. R. EVID. 803(3).  The author of the memorandum's state of mind was not at issue, and the memorandum was not used for that purpose.  It is clear from the record, however, that Bikkina introduced, and the bankruptcy court admitted, the memorandum for the non-hearsay purpose of establishing the recipient's reaction to the document and the statements in it.  *See United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018) ("Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener.").

Bikkina sought to admit Exhibit 141-40 after his counsel asked him how reading portions of it made him feel.  (A.P. Docket Entry No. 221 at 160:7–8 ("[W]hen you read that paragraph,

how did that make you feel?")).  When the bankruptcy court relied on the evidence in its findings and conclusions, it used the "memorandum, which Mahadevan reviewed," as evidence that Mahadevan had "acted with substantial certainty that his allegations of scientific misconduct were false."  *Mahadevan II*, 668 B.R. at 151–52.  The memorandum showed that Mahadevan "was informed several times by different officials at Tulsa that Bikkina committed no wrong doing." *Id.* at 152.

The bankruptcy court did not rely on the memorandum to find that Mahadevan's statements were false.  The California jury already resolved that issue.  *See Mahadevan I*, 617 F. Supp. 3d at 664.  Instead, the bankruptcy court admitted the memorandum as evidence of Mahadevan's knowledge.  The University of Tulsa repeatedly told Mahadevan that Bikkina did nothing wrong; the court admitted those statements as evidence that a reasonable person was on notice that Bikkina did nothing wrong.  *See Air Liquide America Corp. v. Crain Brothers, Inc.*, 11 F. Supp. 2d 709, 716 n.13 (S.D. Tex. 1997) (explaining that the rule that out-of-court statements offered to show their effect on the state of mind of the listener, such as to establish notice or knowledge, are admissible non-hearsay); *see also Hooper-Holmes Bureau v. Bunn*, 161 F.2d 102, 106 (5th Cir. 1947); *Jeanes-Kemp, LLC v. Johnson Controls, Inc.*, No. 1:09-cv-723, 2012 WL 627515, at *11 (S.D. Miss. Feb. 24, 2012).

The opinion in *United States v. Johnson*, 71 F.3d 539 (6th Cir. 1995), is instructive.  In that case, the government prosecuted Johnson for distributing controlled substances without a legitimate medical purpose.  *Id.* at 541.  To prove the offense, the government had to prove that Johnson knew he was prescribing without a legitimate medical purpose.  *See id.* at 542–43.  The government introduced testimony from a former employee of the clinic where Johnson worked, who testified that, on one occasion, another doctor at the clinic had told Johnson that "he was going

to have to stop writing prescriptions like that." *Id.* at 543.  Johnson objected, arguing that the statement was hearsay.  *Id.*  The district court overruled the objection, and Sixth Circuit affirmed. *Id.*  The court concluded that the former employee's testimony about the defendant's statement was "evidence of defendant's knowledge that he was prescribing medication without a legitimate medical purpose and outside the course of professional practice." *Id.*  This case is similar: just as the conversation in *Johnson* put the defendant on notice that his prescriptions were without a legitimate medical purpose, the memorandum, which Mahadevan reviewed, put him on notice that his statements about Bikkina's research misconduct were false.  The memorandum is not hearsay when used for this purpose.

Mahadevan's authenticity objection fares no better.  "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a).  Rule 901 imposes a low bar.  "In deciding questions of authenticity, we do not require conclusive proof of authenticity before allowing the admission of disputed evidence." *United States v. Watkins*, 591 F.3d 780, 787 (5th Cir. 2009).  Rule 901 "merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." *Id.*  "Once the proponent has made the requisite showing, the trial court should admit the exhibit in spite of any issues the opponent has raised about flaws in the authentication." *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) (cleaned up).  "Such flaws go to the weight of the evidence instead of its admissibility." *Id.*  The memorandum at issue, Exhibit 141-40, was addressed to Bikkina.  He testified that the exhibit was the memorandum that he received on or about the date listed on the document, May 28, 2023.  (A.P. Docket Entry No. 221 at 159:6–13).  That testimony is sufficient to establish its admissibility. *See Watkins*, 591 F.3d at 787 (holding the district court

13

did not err in overruling an authenticity objection to a rental application because the application had the defendant's "name, date of birth, address, and signature on it.").

Even if Mahadevan's evidentiary objections were correct, he does not explain why the district court's ruling was unfairly prejudicial. Mahadevan argues in his brief that the memorandum is material because the bankruptcy court repeatedly referred to the document in its opinion. (Docket Entry No. 13 at 37–38). But references to allegedly inadmissible evidence do not mean that the evidence is material. *See United States v. Cuellar*, No. H-24-cr-224, 2025 WL 2687863, at *7 (S.D. Tex. Sept. 19, 2025). The question is whether there is a "reasonable probability that the [decision] would have been different" without the evidence. *Pond v. Davis*, No. H-13-1300, 2019 WL 4644836, at *14 (S.D. Tex. Sept. 24, 2019); *see United States v. Oti*, 872 F.3d 678, 693 (5th Cir. 2017) ("A defendant demonstrates that an error had an effect on his substantial rights when he shows a reasonable probability that the jury, absent the error, would have acquitted him."). The record shows no such reasonable probability.

The bankruptcy court found that Mahadevan "knew with substantial certainty that his allegations of plagiarism were false" because he made them "after being informed that he no longer had co-authorship rights and representing to Tulsa administrator and to Bikkina that he waived such rights." *Mahadevan II*, 668 B.R. at 152. That finding is "plausible" based on admissible evidence. *Cooper*, 581 U.S. at 293. Before the alleged misstatements, Mahadevan sent emails, which are admissible as party-opposing statements, FED. R. EVID. 801(d)(2), confirming that he would no longer raise the issue of misconduct and that Bikkina could publish as a single author, (A.P. Docket Entry No. 141-11). "Bikkina also credibly testified that he offered to credit Mahadevan as a co-author of Paper #1 but that Mahadevan declined the offer." *Mahadevan II*, 668 B.R. at 152 (citing A.P. Docket Entry No. 221 at 26:6–25). There is no clear error in the

bankruptcy court's finding, based on this evidence, that Mahadevan knew with substantial certainty that Bikkina had not plagiarized his work.  Although Mahadevan testified that he merely agreed not to claim misconduct, not that he agreed there was no misconduct, (A.P. Docket Entry No. 223 at 166:14–15), the bankruptcy court's resolution of that factual dispute had ample record support.

This argument does not present a basis to reverse the bankruptcy court's findings.[4]

### 4.    State-Court Filings

Mahadevan next argues that the district court improperly relied on the California state-court complaint[5] and verdict form to hold that his plagiarism allegations were false.  (Docket Entry No. 13 at 38–40).  Mahadevan argues that the bankruptcy court cannot rely on the California state-court proceedings for three reasons: (1) trial courts may not take as true the factual findings and conclusions of another court, *see Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998);

---

[4] Mahadevan renews a host of evidentiary objections in footnotes, listing where in the trial record he made them.  (Docket Entry No. 13 at 55 nn.78–80).  Mahadevan does not argue why these specific exhibits were inadmissible or why they were material to the outcome of this case.  It is not the court's burden to rummage the record to assess each exhibit's admissibility and materiality.  *see Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc.*, 695 F.2d 839, 846–47 (5th Cir.1983) ("Judges are not ferrets!"); *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir.2002) ("'Judges are not like pigs, hunting for truffles buried in' the record." (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991))).  In any event, as discussed, the bankruptcy court's references to Rule 803(3) were simple misstatements, not legal error.  Rule 803(3) was used as a stand-in for evidence that was admissible as Mahadevan's party-opponent statement or for not-hearsay purposes, such as knowledge, notice, and the effect on the listener.

[5] Mahadevan does not explain why the bankruptcy court's reliance on the state-court complaint was erroneous or prejudicial.  "[C]ourts may take judicial notice of documents filed in other courts for the purpose of establishing the fact of litigation and related filings."  *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 695 (W.D. Tex. 2007).  Mahadevan does not explain how the bankruptcy court inappropriately relied on the complaint to determine facts against him.  The bankruptcy court's decision instead reflects that the complaint was used to determine the scope of Bikkina's claims against Mahadevan.  *See Mahadevan II*, 668 B.R. at 153 ("Bikkina's complaint in the State Court Action also makes references to discovery of the same allegations as the basis for intentional infliction of emotional distress.").  That is a fact about the litigation, and the complaint is admissible for that purpose.  *See Mahadevan I*, 617 F. Supp. at 662 (crediting as summary-judgment evidence "the state-court judgment, amended judgment, special verdict form, and jury instructions").

(2) "[a] finding under 'substantially true' standard does not lead to a conclusion that Mahadevan's research misconduct complaints are untrue"; and (3) the state-court judgment was amended after the issuance of the stay and is not valid.  (*Id.*).  Mahadevan's arguments are unpersuasive.

First, Mahadevan confuses judicial notice of facts under Federal Rule of Evidence 201 with the preclusive effect of a final judgment under 28 U.S.C. § 1783.  Under Rule 201, courts may take judicial notice of a fact that is not subject to reasonable dispute.  FED. R. EVID. 201. Under § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *accord Mahadevan I*, 617 F. Supp. 3d at 661. The *Taylor* court recognized this distinction by treating judicial notice and preclusion separately. 162 F.3d at 829, 832.  The bankruptcy court did not err in considering the preclusive effect of the California judgment and the jury's findings that were necessary to reach that judgment.  California courts give preclusive effect to findings of evidentiary facts (simple adjudicatory facts), ultimate facts (facts as applied to the law), and issues of law that are necessary to reach a final judgment. *Key v. Tyler*, 246 Cal. Rptr. 3d 224, 249 (Ct. App. 2019); *see* RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (AM. L. INST. 1982) ("An issue on which relitigation is foreclosed may be one of evidentiary fact, of 'ultimate fact' (i.e., the application of law to fact), or of law.").  The bankruptcy court could properly rely on the California jury's finding that Mahadevan's allegations of plagiarism were not substantially true.  (A.P. Docket Entry No. 141-2 at 5–6).

Second, the California jury's determination that Mahadevan's allegations of plagiarism and data falsification were not "substantially true" is the same as finding that "Mahadevan's research misconduct complaints are untrue."  Mahadevan tries to frame California's substantially-true standard as imposing a higher burden of proof than the preponderance-of-the-evidence standard

that applies to this bankruptcy proceeding.  (Docket Entry No. 13 at 38–39).  His argument is flawed because the substantially-true standard is not a level-of-certainty standard, such as "preponderance of the evidence," "clear and convincing evidence," or "beyond a reasonable doubt."  The California jury was instructed to find by a preponderance of the evidence whether Mahadevan's allegations were substantially true or not.  (A.P. Docket Entry No. 20-5 at 8, 33; A.P. Docket Entry No. 141-2 at 5–6).

Substantial truth under California law is a substantive legal standard, not a burden of proof.  The substantial-truth standard recognizes that not everything a defamation defendant says must be false; the issue in the defamation action was not whether Mahadevan's statements were "true [or false] in every detail."  (A.P. Docket Entry No. 20-5 at 33).  The question is whether the gist, main point, or heart of the matter in question was true or false.  *Emde v. San Joaquin Cnty. Cent. Lab. Council*, 143 P.2d 20, 28 (Cal. 1943); *Issa v. Applegate*, 242 Cal. Rptr. 3d 809, 824 (Ct. App. 2019); *accord Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991).  The California jury determined by a preponderance of the evidence that the thrust of Mahadevan's allegedly defamatory statements—that Bikkina plagiarized and falsified research papers and presentations— were false.  The California jury found that Bikkina did not plagiarize or falsify research.  The bankruptcy court appropriately gave preclusive effect to that factual finding.[6]

---

[6] Mahadevan appears to argue that the bankruptcy court reversed its finding that Bikkina did not commit wrongdoing.  (Docket Entry No. 13 at 52).  The bankruptcy court's reconsideration order does not go that far; it says only that one specific sentence in its opinion did not constitute a finding that Bikkina did not commit wrongdoing.  (Docket Entry No. 247 at 3 ("*This* finding is not a finding by the Court that Bikkina did in fact commit no wrong doing or that Mahadevan gave up his authorship rights.  *The* finding is merely that Mahadevan knew of Tulsa's position." (emphasis added)).  In any event, this court can affirm on any basis in the record.  *Placid Oil Co. v. C.C. Abbitt Farms, LLC*, 561 B.R. 60, 64 (N.D. Tex. 2016).  The preclusive effect of the state-court judgment is properly before this court.

Third, the stay order does not undermine the preclusive effect of the California judgment. Mahadevan raised the stay order in the California courts and before this court.  Both rejected this argument.  "There is no violation of the stay order."  *Mahadevan I*, 617 F. Supp. 3d at 662.

The bankruptcy court did not err in giving preclusive effect to the state-court jury's determination that Mahadevan's research-misconduct complaints against Bikkina were untrue.

### B.        Subjective Intent to Harm

Mahadevan argues that he did not act with the intent to harm because: (a) he subjectively did not intend to cause injury but instead to spur an investigation of research misconduct out of good-faith concern for academic integrity; and (b) he truthfully stated that Bikkina committed research misconduct.  (Docket Entry No. 13 at 40–44).  Mahadevan's theory fails because it argues the wrong legal standard and attempts to relitigate the California judgment.

Mahadevan starts from the premise that he subjectively believed his allegations to be true and that the bankruptcy court credited those beliefs.  *See Mahadevan II*, 668 B.R. at 150 ("Bikkina has not met his burden of showing that Mahadevan acted with subjective intent to injure Bikkina by making allegations of scientific misconduct.").  Mahadevan argues that this ends the matter, because he introduced evidence "confirming that his allegations are true."  (Docket Entry No. 13 at 41).  But, as discussed, the state-court judgment precluded the bankruptcy judge from upholding arguments that Mahadevan's allegations are true.  *See Key*, 246 Cal. Rptr. 3d at 250 (holding that "express findings . . . concerning issues that were actually litigated and that support the decision" have issue-preclusive effect).    The questions before the bankruptcy judge were whether Mahadevan "subjectively intended to cause injury or was substantially certain that injury would follow from his conduct."  *Mahadevan I*, 617 F. Supp. 3d at 666 (cleaned up).  Answering the former question in Mahadevan's favor did not resolve the adversary proceeding.  *See id.*; *In re*

18

*Vollbracht*, 276 F. App'x 360, 361–62 (5th Cir. 2007) ("Because debtors generally deny that they had a subjective motive to cause harm, most cases that hold debts to be non-dischargeable do so by determining whether the debtor's actions were at least substantially certain to result in injury." (cleaned up) (citing *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998))).

The bankruptcy court properly addressed this prong of the dischargeability analysis.

## C.    Objective Substantial Certainty of Harm

Mahadevan next argues that the bankruptcy court did not adequately find that his actions were substantially certain to result in injury.  (Docket Entry No. 13 at 44–56).  Mahadevan raises three arguments in support of his overall point: (1) that Bikkina failed to introduce explicit evidence in support of a finding that Mahadevan's actions were substantially certain to result in injury; (2) that his allegations of Bikkina's wrongdoing were true; and (3) that his complaints of scientific-research misconduct were not substantially certain to result in harm.  (*Id.*).  Mahadevan is precluded from arguing that his allegations of plagiarism and data-falsification are true.  The other two arguments do not warrant reversal.

"Substantial certainty of harm" does not mean "absolute certainty," but it does require more than a "high probability."  *In re D'Amico*, 509 B.R. 550, 561 (S.D. Tex. 2014).  Applied to this case, Bikkina must show that Mahadevan knew that his statements were false, but spread them anyway, knowing they would harm Bikkina.  *Mahadevan I*, 617 F. Supp. 3d at 664; *see In re Marshall*, 264 B.R. 609, 630 (C.D. Cal. 2001) ("Libel and defamation claims are nondischargeable under § 523(a)(6) when the statements were made with actual knowledge of their falsity."); *In re Mason*, 1999 WL 58579, at *3 (Bankr. S.D.N.Y. 1999) ("The intentional tort of defamation may constitute 'willful and malicious injury' by the debtor to another entity under § 523(a)(6) of the Bankruptcy Code, as long as the debtor knew the published statements were false.").

First, the bankruptcy court did not clearly err in finding that Mahadevan knew that his allegations that Bikkina plagiarized his work and that Bikkina falsified data were false. *Mahadevan II*, 668 B.R. at 151–52.  The bankruptcy court found that Mahadevan knew his plagiarism allegations against Bikkina were false because Mahadevan was informed several times by different officials at the University of Tulsa that Bikkina had committed no wrongdoing; because Mahadevan agreed that he would no longer pursue plagiarism allegations against Bikkian; because Mahadevan allowed Bikkina to publish the allegedly plagiarized paper without crediting Mahadevan as an author; and because Mahadevan declined Bikkina's offer to credit Mahadevan as a co-author.  *Id.*  Mahadevan argues that every piece of evidence on which the district court relied was unauthenticated hearsay testimony.  (Docket Entry No. 13 at 44–48).  As explained, these objections fail.  On the merits, Mahadevan argues that he never waived his authorship rights in the paper, never received the memorandum clearing Bikkina of wrongdoing, and had no reason to believe the memorandum because the University of Tulsa never investigated his allegations. These arguments also fail.

The record shows that Mahadevan had ample notice that his claims against Bikkina were false.  *See Mahadevan II*, 558 B.R. at 144–46.  From April 2011 through October 2013, Mahadevan repeatedly accused Bikkina of plagiarism and data falsification.  *See id.*  Every person to whom Mahadevan sent his accusations rejected them.  *See id.*  In April and May 2011, Mahadevan complained about Bikkina to editors at the IJGGC and officials at the University.  (A.P. Docket Entry No. 141-7).  The IJGGC considered his allegations, asked for a response from Bikkina, and published the article after it concluded that the issues were resolved.  (A.P. Docket Entry No. 141-8; A.P. Docket Entry No. 169-3; A.P. Docket Entry No. 221 at 91:4–25, 120:5–10).  The University of Tulsa administration supported the IJGGC publishing in Bikkina's name.  (A.P. Docket Entry

Nos. 141-11, 141-13, 141-15).  Mahadevan levied several more complaints about Bikkina to the University and Bikkina's colleagues through the end of 2011, (A.P. Docket Entry Nos. 141-17, 141-25, 141-27).  All the allegations were rejected. Uppaluri and Shoham both published the second paper without adding Mahadevan as a co-author.  (A.P. Docket Entry No. 169-4).  The University, after receiving each of these complaints, endorsed Bikkina's authorship of the second paper and did not require him to credit Mahadevan.  (A.P. Docket Entry No. 141-30).  And after another round of complaints and allegations, (A.P. Docket Entry Nos. 141-36, 141-39), the University issued a final memorandum finding no wrongdoing on Bikkina's part, (A.P. Docket Entry No. 141-40).[7]  That memorandum was addressed to Mahadevan, and he reviewed it.  (*Id.*; A.P. Docket Entry No. 224 at 88:1–89:9, 101:1–23).  Even after these repeated rejections of his accusations, Mahadevan continued to assert that Bikkina plagiarized his work and falsified data. (A.P. Docket Entry No. 221 at 165:7–166:8, 167:14–169:10; A.P. Docket Entry No. 141-43).

The bankruptcy court's finding that "Mahadevan knew his allegations of scientific misconduct were not substantially true," *Mahadevan II*, 668 B.R. at 152, is more than "plausible" on this record, *Cooper*, 581 U.S. at 293.  Mahadevan's evidentiary objections do not call into question the bankruptcy court's findings.[8]  Each of the emails and documents on which the

---

[7] Mahadevan argues that the University's memorandum is immaterial because his experts testified that the University did not investigate Mahadevan's claims before concluding that Bikkina committed no wrongdoing. (Docket Entry No. 13 at 46, 51).  Mahadevan's argument does not offer a reason to disturb the bankruptcy court's findings because the relevant question is about what Mahadevan knew at the time, *In re D'Amico*, 509 B.R. at 559—that everyone to consider his complaints against Bikkina rejected them. Mahadevan did not object to the memorandum's findings when he received it in 2013.  (A.P. Docket Entry No. 224 at 88:23–89:11, 101:15–17).  His expert's testimony is an after-the-fact attempt to disprove the memorandum and the University's findings and to show that he should not have believed them.  But his attempt to discredit the University's conclusions now does not change the effect it had on his knowledge back in 2013, when he continued to state that Bikkina committed research misconduct.

[8] The exhibits cited by the bankruptcy court, *see Mahadevan II*, 558 B.R. at 144–46, have enough detail on their face to support their authenticity, *see Corbett v. Texas Tech Univ. Health Scis. Ctr.*, No. 5:21-CV-281-H, 2023 WL 4424269, at *12 (N.D. Tex. July 10, 2023) ("Some evidence may also be authenticated by

bankruptcy court relied, including the memorandum, were admitted for a non-hearsay purpose: to establish the fact of the communication and their effect on the recipients. *Reed*, 908 F.3d at 120. The bankruptcy court's findings are also plausibly drawn from Mahadevan's own statements. FED. R. EVID. 801(d)(2). Mahadevan knew that Bikkina's co-authors and the University thought his allegations lacked veracity because Bikkina published both of his papers, with their support, despite Mahadevan's allegations.[9] After the papers were published, Mahadevan added new allegations to his complaints against Bikkina, such as those about Bikkina's 2009 presentation and dissertation. Mahadevan's escalating allegations in the face of continued adverse findings are additional support for the bankruptcy court's findings. *See In re Cueva*, 371 F.3d 232, 236 (5th

---

distinctive looking characteristics, such as the document's appearance, contents, and substance."); *United States. v. Fluker*, 698 F.3d 988, 999–1000, (7th Cir. 2012) (finding an email to be authentic based on the sender's and recipient's email addresses and the context of the email). Sponsoring witnesses also offered sufficient corroborating detail to support their authenticity. (*See generally* A.P. Docket Entry Nos. 221–227).

[9] Mahadevan argues that the bankruptcy court erred in inferring from the fact that the journal published Bikkina's work that Bikkina did not plagiarize or falsify data. (Docket Entry No. 13 at 53–54). He argues the that the bankruptcy court did not credit his impeachment evidence, an email from the associate editor at the IJGGC that purportedly states that the journal's "publication [decision] doesn't mean that the paper is sound." (*Id.*). Mahadevan misconstrues this email. First, Mahadevan omitted from his brief the email's context: it was the April 2011 response from the IJGGC's associate editor to Mahadevan after Mahadevan first alleged that Bikkina falsified data. (*See* A.P. Docket Entry No. 169-17). The associate editor commented that the journal's decision to publish did not reflect that the paper was sound because "the reviewers ha[d] no way of being aware of the details that [Mahadevan just] provided." (*Id.*). The email is not, as Mahadevan attempts to suggest, a blanket statement that the IJGGC knowingly publishes papers that have false data or that the journal does not review papers for false data. The editor instead explained that the journal would stop publication until the issue was resolved. Second, Mahadevan omitted the additional explanation that the associate editor offered. Mahadevan quotes the editor's statement that the "graduate school and the department did not do their job," (Docket Entry No. 13 at 54), attempting to suggest that editor thought the University did not adequately investigate Bikkina's alleged falsification *before* the University supported publishing the paper in Bikkina's name. The editor actually said that he thought the "graduate school and the department did not do their job by putting the onus on journal reviewers." (*See* A.P. Docket Entry No. 169-17). The editor's statement does not support Mahadevan's argument that the University was wrong to support Bikkina's authorship and the piece's publication because the research was falsified. It instead highlights that Mahadevan knew that the journal accepted Bikkina's piece even after its editor expressed concern about the potential of publishing manipulated results. The editor's email is probative evidence that Mahadevan knew his allegations against Bikkina were false. Mahadevan's supposed impeachment instead supports the bankruptcy court's findings.

Cir. 2004) (holding that reviewing courts "may affirm if there are any grounds in the record to support the judgment, even if those grounds were not relied upon by the courts below").

Mahadevan argues that the bankruptcy court did not apply the proper standard.  He argues that "explicit evidence" must support a finding of substantial certainty.  *In re Williams*, 337 F.3d 504, 511 (5th Cir. 2003).  The case Mahadevan relies on, *In re D'Amico*, undermines his argument. In that case, the court found that the Appellant "relied solely on third-party information" about what knowledge a person in D'Amico's shoes would be expected to have, not evidence showing "D'Amico's personal knowledge."  509 B.R. 550, 560 (S.D. Tex. 2014).  By contrast, here, Bikkina introduced evidence of what Mahadevan personally knew.  The record reflects that practically every person Mahadevan spoke to about Bikkina rejected Mahadevan's claims.  By 2013, when he alleged to the National Laboratory that Bikkina plagiarized and falsified data, any reasonable person in his shoes would have known that his allegations against Bikkina had been consistently and repeatedly rejected as false.  The evidence in this case is not based on inferences from third parties or general industry knowledge.  The bankruptcy court's findings were based on explicit evidence of what facts Mahadevan knew.  They satisfy Fifth Circuit precedent.  The bankruptcy court did not clearly err in finding that Mahadevan knew his allegations of plagiarism and data fabrication were false when he made them.

Second, Mahadevan knew that his allegations would harm Bikkina. Accusations that a researcher lacks honesty and integrity strike at the heart of their "livelihood" and "are of such a nature and so egregious that both injury and intent may properly be inferred for purposes of section 523(a)(6), as those acts are substantially certain to cause harm."  *In re Sligh*, No. 21-30915-SGJ7, 2022 WL 1101537, at *5 (Bankr. N.D. Tex. Apr. 12, 2022).  Mahadevan argues in his brief that "mere misconduct complaints" do not lead to certain injury because, if they did, then "thousands

23

of research misconduct complaints under the federal policies filed all across the country would lead to certain injuries." (A.P. Docket Entry No. 13 at 59–60). He highlights his expert's testimony that research misconduct complaints do not frequently injure individuals. (*Id.*). And he argues that Bikkina could have avoided injury by retracting the plagiarized and infringing articles, placing the blame for any injury on Bikkina. (*Id.* at 61).

Mahadevan's arguments run headlong into the state-court judgment. The "jury awarded Bikkina $776,000 in compensatory damages." *Mahadevan I*, 617 F. Supp. at 657. The jury found by a preponderance of the evidence that Mahadevan's allegations caused Bikkina harm. (A.P. Docket Entry No. 20-5; A.P. Docket Entry No. 141-2 at 6–7). The bankruptcy court found that when Mahadevan made his allegations, he knew they would cause Bikkina harm. (A.P. Docket Entry No. 223 at 37:18–38:5). Mahadevan's extensive efforts to spread his belief that Bikkina was not an honest researcher belie his argument that his allegations against Bikkina were not material. Mahadevan argues that he told others about Bikkina to protect the public interest. (Docket Entry No. 13 at 58–59). But that argument acknowledges that a false allegation that a scientist lacks integrity and honesty is certain to injure that individual.

Mahadevan's remaining arguments do not dispute this point. He instead argues that the way he made his allegations was not substantially certain to result in injury to Bikkina. (Docket Entry No. 13 at 55–56). Mahadevan's argument is untethered to the facts of this case. As the bankruptcy court explained, Mahadevan abused the academic process by submitting repeated complaints of plagiarism after the academic processes for investigating such allegations had shown no violations. *See Mahadevan II*, 668 B.R. at 154. Mahadevan emailed Bikkina's co-authors about his allegations, repeated his allegations in a presentation at the National Laboratory, and emailed a National Laboratory official about his allegations against Bikkina. The last two

24

allegations happened after the University cleared Bikkina of wrongdoing.  There is a "pattern" of Mahadevan repeating his allegations "to institutions and individuals who Mahadevan knew had direct influence over Bikkina's career and reputation as a scientist."  *Id.* at 153.  The bankruptcy court's finding that "Mahadevan knew it was substantially certain that such repeated allegations would cause emotional distress" and "would tarnish Bikkina's reputation for truth and honesty in front of his peers and superiors in his scientific community and cause fear of losing his occupation," *id.*, is more than "plausible" on this record, *Cooper*, 581 U.S. at 293.

The bankruptcy court did not clearly err in finding that Mahadevan "acted with knowledge that his actions were substantially certain to injure Bikkina when he defamed and inflicted emotional distress upon Bikkina."  *Mahadevan II*, 668 B.R. at 153.

> ### D.      Substantial Justification

Lastly, Mahadevan argues that he was substantially justified in alleging that Bikkina plagiarized and falsified research papers.  (Docket Entry No. 13 at 57–61).  Substantial justification is a stopgap defense after a court finds that a debtor acted with objective substantial certainty of harm.  *See Mahadevan I*, 617 F. Supp. at 666 (citing *Vollbracht*, 276 F. App'x at 362).  Substantial justification is a question of fact for the bankruptcy court to resolve.  *Arguello v. LaFavers*, 448 F. Supp. 3d 655, 665 (S.D. Tex. 2020).  Mahadevan argues that his motives were to comply with his obligations under University and ethical guidelines on academic integrity, to secure his intellectual property, and to protect the public from false research.  *Id.*  Again, the problem with Mahadevan's arguments is not the *why*, but the *how*.

Mahadevan might have been substantially justified in pursuing his allegations, even if they were ultimately proven false, if he made them through appropriate channels.  As the bankruptcy court recognized, Mahadevan acted appropriately in "pursuing legal action against Bikkina" by

serving "a cease and desist letter," registering "copy rights for work that Bikkina allegedly plagiarized," and suing Bikkina "in the Northern District of Oklahoma for copyright infringement." *Mahadevan II*, 668 B.R. at 154. California privileges false statements made in good-faith prelitigation letters and legal filings. *Aronson v. Kinsella*, 68 Cal. Rptr. 2d 305, 315 (Ct. App. 1997). Mahadevan was not justified, however, in taking "matters into his own hands, by asserting serious allegations against Bikkina without having a reasonable basis for believing that the allegations were true." *Mahadevan II*, 668 B.R. at 154–55. Mahadevan's conduct at the National Laboratory, for example, was unjustified self-help.[10] He did not pursue legal action to protect his intellectual property until after a California jury determined that his allegations against Bikkina were false. There is no substantial justification for Mahadevan repeating his allegations against Bikkina outside proper professional and legal channels after multiple people rejected them.

Mahadevan offers two final arguments. First, he argues that his academic complaints were appropriate in part because courts require litigants to exhaust administrative remedies in academic disputes. But Mahadevan continued to pursue his misconduct allegations *outside* the academic process after submitting his complaints, without success. For instance, he emailed Uppaluri, Bikkina's co-author on the CO2-Water System paper, asserting co-authorship rights and that Bikkina's failure to credit Mahadevan was part of "a number of untoward incidents." (A.P. Docket Entry No. 141-27). After the University resolved Mahadevan's complaint, he did not file a lawsuit but instead repeated his allegations of data falsification in a presentation at the National Laboratory and to officials at the National Laboratory. (A.P. Docket Entry No. 224 at 96:16–99:5; A.P. Docket

---

[10] Mahadevan objects to the admission of Exhibit 141-43, his email to an official at the National Laboratory, in which he repeats his allegations against Bikkina. (Docket Entry No. 13 at 59). The email is sufficiently authentic on its face because Mahadevan's email address is listed on it and the content of the email is consistent with the rest of the evidence in dispute. *See Corbett*, 2023 WL 4424269, at *12. Because it is Mahadevan's email, it is excluded from hearsay as a party-opponent statement. FED. R. EVID. 801(d)(2).

Entry No. 221 at 162:12–65:25, 167:14–69:10; A.P. Docket Entry No. 141-43).  This conduct was unjustified.

Second, he argues that courts often dismiss defamation actions in similar cases, showing that his conduct was appropriate.  (Docket Entry No. 13 at 60–61 (first citing *Chandok v. Klessig*, 632 F.3d 803, 816 (2d Cir. 2011); and then citing *Gino v. President and Fellows of Harvard College*, No. 23-cv-l l 775, ECF No. 74 (D. Mass. 2024)); *see also* Docket Entry No. 16 at 16–18 (citing additional cases)).  This argument relitigates the California jury verdict against him.  If Mahadevan believed that part of the alleged misconduct against him was privileged, then he should have raised that argument as a defense in the California proceedings.  He did not.

Mahadevan also fails to explain how his conduct in this case is protected.  At most, the cases he cites support the proposition that academic researchers may have a qualified or partial privilege to report academic misconduct.  *See Chandok*, 632 F.3d at 816.  But even *Chandok*'s qualified privilege would not apply in this case because it does not protect a defendant who speaks with reckless disregard for the falsity of defamatory statements.  *See id.* at 815.  The bankruptcy court's findings that Mahadevan knew his statements were false when he made them pierce the shield that he now tries to raise.

The bankruptcy court did not clearly err in finding that "Mahadevan was not sufficiently justified under the circumstances when he acted with substantial certainty of harm to defame and inflict emotional distress upon Bikkina."  *In re Mahadevan II*, 668 B.R. at 155.

## IV.   Conclusion

The bankruptcy court did not clearly err in finding that "Mahadevan was willful and malicious in inflicting emotional distress on Bikkina and was also willful and malicious in defaming Bikkina."  *In re Mahadevan II*, 668 B.R. at 155.  The bankruptcy court did not commit

legal error in concluding that "Mahadevan's judgement debt owed to Bikkina . . . is excepted from discharge as a debt for a willful and malicious injury to another entity or to the property of another entity pursuant to 11 U.S.C. § 523(a)(6)." *Id.* at 155–56.

The bankruptcy court's judgment, (A.P. Docket Entry No. 240), is **AFFIRMED**.

SIGNED on November 24, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge